UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROTESHIA THOMAS,

                Plaintiff,

                                     Case Number 11-cv-15450

v.                                   Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____ /

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING JUDGMENT OF ADMINISTRATIVE LAW JUDGE**

"Social Security proceedings," the Supreme Court instructs, "are inquisitorial rather than adversarial. It is the [administrative law judge's] duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)). And the judge's duty is "heightened" if a claimant "is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (citing *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 856 (6th Cir.1986)).

The plaintiff in this case appeared before the administrative law judge without counsel. She asked for a continuance to obtain representation. *See* R. at 31. The judge agreed and continued the hearing for four months. When the hearing resumed four months later, however, the plaintiff again appeared without counsel. The hearing proceeded.

Following the hearing, the administrative law judge issued a decision denying the plaintiff's application for social security disability benefits. The plaintiff appeals. The principal question is whether the administrative law judge fulfilled his obligation to scrupulously and conscientiously develop a full and fair record.

For the reasons that follow, this question is answered in the affirmative. Briefly, the judge meticulously explored the facts and circumstances of the plaintiff's claim. The judge elicited responses that vividly portrayed the extent of the plaintiff's limitations. Simply, the judge faithfully, fully, and fairly developed the record. Punctuating that conclusion, the plaintiff identifies no objective medical evidence in the record that the judge did not consider.

Accordingly, the administrative law judge's decision will be affirmed.

# I

Plaintiff Roteshia Thomas is a 34-year-old woman. In the 10th grade, she became pregnant and left school. R. at 247. She has not returned, although she has enrolled in classes to obtain a GED. *See, e.g*., R. at 33, 289. (While in school, Plaintiff was never in special education. R. at 247.)

On December 30, 2008, Plaintiff filed an application for Social Security disability benefits with Defendant Commissioner of Social Security. *See* R. at 11. Alleging a disability onset date of July 1, 2007, Plaintiff asserted that depression, migraines, bad heartburn, and sleep problems left her unable to work. *See* R. at 48. The relevant medical evidence in the record, however, begins in 2008.[1]

---

[1] While there is also evidence from the Roosevelt Ruffin Health Center predating 2008, R. at 228–42, neither party relies on it.

**A**

Cathedral Mental Health Care

**1**

Specifically, the record begins in February 2008, when Plaintiff appeared at Cathedral Mental Health Care for a "client assessment."  Plaintiff R. at 223–27.

In the assessment, Plaintiff denied a history of mental illness.  R. at 223.  She explained that she was seeking treatment because "she wants more in her life [and] for her son.  She does not feel good about herself."  R. at 223.  Plaintiff further explained that she "has been unemployed for nearly five years.  Acknowledges she has become comfortable and is fearful of change yet wants change."  R. at 223.

Assessing Plaintiff's strengths, the mental health professional noted that Plaintiff was "articulate, has some sense of a spiritual identity, [and] demonstrates social skills."  R. at 224.  Plaintiff's appearance was categorized as "neat [and] clean," her manner as "frank" and "polite," her thought process as "organized," and her insight and judgment as "good."  R. at 225–26.

Plaintiff's diagnostic summary was that she "has both inner resources as well as environmental resources available to her.  Inability to enact change which is desired, due to fear.  Has become accepting of lifestyle she has become accustomed to yet a part of [Plaintiff] knows she is entitled [and] capable of more."  R. at 227.

The treatment plan was to begin counseling and "explore course offerings [at] Delta College."  R. at 227.  And so the treatment began.

**2**

March 2008.  Plaintiff met with a Cathedral Mental Health Care therapist, reporting that she "feels used by [her] family, has difficulty saying no.  [She] sees self as caregiver to all."  R. at 221.  The therapist taught Plaintiff "coping strategies" and "use of affirmation."  R. at 221.

**3**

April 2008.  Plaintiff met with her therapist and "wanted to talk about her son and the lack of his father's involvement in his life. . . .  Examined other role models in son's life."  R. at 220.  The therapist also addressed Plaintiff's self-esteem issues, finding Plaintiff "very responsive."  R. at 220.

**4**

May 2008.  Meeting with the therapist, Plaintiff "shared insights gained over the past two weeks re[garding] childhood incidents and how they impacted her adult life."  R. at 217.  The therapist, in turn, "[e]ncouraged continued journaling, self-reflection."  R. at 217.

**5**

June 2008.  Plaintiff had suffered a shock, she told her therapist.  R. at 216.  Her "son's friend was shot [and] killed in a drive-by shooting last week.  She is of course very concerned for her son's safety. . . .  [Plaintiff] has been thinking of moving but was hoping to wait until next year."  R. at 216.  Plaintiff and her therapist discussed the "feasibility" of moving.  R. at 216.

**6**

July 2008 was an eventful month for Plaintiff.  On July 8, Plaintiff informed her therapist that she "had a house fire last [week]."  R. at 215.  Plaintiff also disclosed that she was "working [with] her homeowners insur[ance regarding] repairs and feels she is being taken advantage of."  R. at 215.  "The issue was addressed," the therapists notes conclude.  R. at 215.

On July 29, Plaintiff again met with her therapist, recounting that she "was feeling stressed because of multiple issues she's had to deal with this week.  Her son had surgery (outp[atient]) and pain was not controlled.  [Plaintiff] had to take him back to the hospital.  Her house burned down [at] the beginning of the month and she is having difficulty getting insur[ance] to pay for repairs."  R. at 214.  Plaintiff and her therapist then worked on "[s]tress management."  R. at 214.

**7**

August 2008.  Talking with her therapist, Plaintiff again explained how she was "feeling victimized / used by family members."  R. at 213.  Plaintiff's father received particular attention in the discussion, with the therapist reporting that Plaintiff "continues to hope her father will show her that he loves her [and] not only what she is capable of doing for / giving him."  R. at 213.  The therapist "encouraged [Plaintiff] to nurture self, develop other emotionally satisfying relationships."  R. at 213.

**8**

September 2008.  Another month of family-focused therapy.  On September 2, Plaintiff and her therapist again explored Plaintiff's relationship with her father.  R. at 212.  "She feels he [and] other males she knows have a sense of entitlement," the therapist reported, continuing: "She feels taken advantage of."  R. at 212.  Plaintiff also examined "how she raises her son differently than she was raised and how healing this is for her."  R. at 212.

On September 23, Plaintiff's relationship with other family members was explored.  R. at 211.  Specifically, Plaintiff and her therapist discussed "additional family members who are dependent upon her for transportation, shelter, material goods, etc.  We talked about codependency and how it comes about."  R. at 211.

**9**

October 2008.  On the seventh, Plaintiff met with her therapist, explaining that she "continues to feel that [her] family take advantage of her."  R. at 210.  Plaintiff also disclosed that she "feels guilty" when "she cannot provide for her mother and siblings as well as her own son."  R. at 210.  The therapist "[e]xplored roots of these feelings" with Plaintiff.  R. at 210.

On October 21, Plaintiff told her therapist that Plaintiff had been in a car accident "to the extent that she really should not be driving it."  R. at 209.  "She also [received] a traffic violation," the therapist noted, continuing: "[Plaintiff] does not have funds to address either issue."  R. at 209.  The therapist and Plaintiff developed a plan for Plaintiff to request community service from the court instead of a fine, as well as contacting a lender to obtain a line of credit to repair the car.  R. at 209.

**10**

December 2008.  Plaintiff informed her therapist that she "has had another accident with her car.  She describes a streak of 'bad luck' [and] wonders why God is doing this to her."  R. at 206.  The therapist sought "to correct the perception" that God was singling Plaintiff out for punishment and "incorporated spiritual principles which [Plaintiff] was receptive to."  R. at 206.

**11**

January 2009.  Plaintiff met with her therapist, explaining that "numerous relatives live in [Plaintiff's] home and [she] feels responsible for them.  She also sees family members as a reflection of herself.  Educated her [regarding] codependency."  R. at 205.  "Will schedule next week," the therapist's note observes, "and discuss moving to bi[-weekly appointments]."  R. at 205.

**12**

The next session, however, does not appear to have been held.  In fact, there is no evidence in the record that Plaintiff had any more sessions with Cathedral Mental Health Care after January 2009.

**B**

State Examiners

**1**

Plaintiff, as noted, filed for disability benefits on December 30, 2008.  In March 2009, Plaintiff underwent a consultative psychological evaluation performed by Dr. Nathalie Menendes, a psychologist retained by the State of Michigan Disability Determination Service. R. at 246–50.

Plaintiff informed Dr. Menendes that she "currently lives in a house with her mother [age 49] and son [age 13].  She shared she has a good relationship with her son.  Her relationship with her mother is 'okay.'  She talks to her father but they are not close.  She does not get along with two of her sisters.  She has good relationships with her other siblings [one sister and two brothers]."  R. at 247.

Plaintiff further informed Dr. Menendes that on a typical day "she feels irritable and angry most of the time . . . .  She argues with people and then feels guilty about it."  R. at 246. Plaintiff also reported that "she feels sad 'every day.'  She does not have much motivation and she avoids interacting with others. . . .  She feels she has been having symptoms of depression for the past few years."  R. at 246.

Turning to interests and activities, Plaintiff explained that she "she enjoys going to her son's sporting events."  R. at 247.  Although Plaintiff "used to like going to Bingo," she reported that she had "lost interest in this activity."  R. at 247.

Plaintiff also disclosed that she "does not do any chores.  Her mother does all the chores such as cooking, cleaning, laundry, and grocery shopping.  When she is awake, she watches TV, listens to music and sometimes reads."  R. at 247.

"Based on today's exam," Dr. Menendes concluded, "the claimant is able to understand, retain, and follow simple and one step instructions.  She is able to perform and remember simple, routine, and repetitive tangible tasks.  She does not appear to have any significant intellectual limitations."  R. at 249.

But Dr. Menendes cautioned that Plaintiff "left school in the 10th grade and there is some mention of possible reading problems in her Function Report.  As such she may have difficulty with performing complex or multi-step tasks, making independent work related decisions, or engaging in abstract thinking and work that is not routine."  R. at 249.

Additionally, Dr. Menendes cautioned that Plaintiff "does not handle frustrating situations well and should not be expected to be able to cope with stress or difficult situations in the work setting."  R. at 249.

**2**

After Dr. Menendes's examination, a state agency psychologist, Dr. Ron Marshall, reviewed the medical evidence in Plaintiff's file.  R. at 252–73.

Dr. Marshall rated Plaintiff's mental residual functional capacity in 20 categories on a scale of "not significantly limited" to "moderately limited" to "markedly limited."  R. at 266–67.

He concluded that Plaintiff was "moderately limited" in six of the categories.  R. at 266–67.  These were the ability to: (1) "carry out detailed instructions"; (2) "perform within a schedule, maintain regular attendance, and be punctual within customary tolerances": (3) "work in coordination with others without being distracted by them"; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace"; (5) "interact appropriately with the public"; and (6) "respond appropriately to changes in the work setting."  R. at 266–67.

In the remaining 14 categories, however, Dr. Marshall concluded that Plaintiff was "not significantly limited."  R. at 266–67.  (Dr. Marshall found that Plaintiff was not "markedly limited" in any category.)

Summarizing his findings, Dr. Marshall tersely observed that Plaintiff "[r]etains ability to do rote tasks.  Able to follow at least simple verbal instructions.  May work better with minimal contact with the public.  May have difficulty [w]ith complex tasks."  R. at 268.

### C

### Westlund Guidance Clinic

### 1

In June 2009, Plaintiff sought treatment from the Westlund Guidance Clinic in Saginaw, Michigan for "anxiety, depression, and a lot of ongoing anger."  *See* R. at 314–26 (adult assessment summary).  Plaintiff also reported that "she doesn't do well with others or following directions."  R. at 319.

Her intake assessment showed her to have demonstrated "clear" speech, "organized" thoughts, "appropriate" memory, "average" intelligence, "good" rapport, and "no problems"

thinking.  R. at 314.  It noted her strengths as being "a good mom and caregiver."  R. at 324.  And it set as her goals addressing her "depression, anxiety and anger."  R. at 324.

Plaintiff then began regularly seeing a therapist at the Westlund clinic.  *See* R. at 312.

## 2

June 2009.  At her first counseling session (on June 22), Plaintiff's mental status was described as "enthusiastic."  R. at 312.  Plaintiff rated her depression at "8 on a scale of one to ten.  She also rates anxiety at 8.  The anger seems to come when she's depressed."  R. at 312.

"She thinks her sisters do things just to annoy her," the therapist reported, continuing: "She says she is a very angry person.  Not angry at her mom, now . . . .  [But is] angry with [her] son's father.  She doesn't like being around people."  R. at 312.

Under "progress," the therapist noted that Plaintiff had "vented [regarding her] family system."  R. at 312.

## 3

July 2009.  Plaintiff saw her therapist again on July 9, presenting as "stressed [and] tired."  R. at 311.  "She says she sees her life as boring," Plaintiff's therapist recorded, "a duty or a hassle."  R. at 311.  After discussing her relationships with her siblings, Plaintiff agreed to "keep a journal of interaction."  R. at 311.

Plaintiff returned on July 21 frustrated with her son's basketball coach.  R. at 310.   She complained that she had "put down $100.00.  Now the coach wants $50.00 for [a trip to] Chicago."  R. at 310.  Plaintiff decided to withhold the money "until it's time to leave."  R. at 310.  Plaintiff also expressed frustration with her son's father, noting that he "doesn't provide anything except $100.00 [per month].  He won't help with extras, like basketball."  R. at 310.

The therapist noted under "progress" that Plaintiff had "vented about her anger [with] her son's father [and] coach." R. at 310.

**4**

August 2009. Plaintiff underwent a psychiatric evaluation performed by Dr. Sunil Koneru of the Westlund Child Guidance Clinic. R. at 285–87.

Plaintiff explained that she was coming to the clinic "for her anger, frustrations, and anxiety," elaborating that she "doesn't know how to react to [her] mother or father because nobody taught her anything. . . . [S]he is mad at people and having mood swings. She is not able to sleep well, has anxiety, nervousness, paranoia, and is suspicious of other people." R. at 285. Plaintiff also reported that "she is not doing any work, and she stopped going to school in the 10th grade." R. at 285.

Dr. Koneru observed that Plaintiff "was cooperative. Eye contact was good. Affect was depressed. Mood was sad. Speech was of low rate and rhythm and logical. . . . Memory was fair in all areas. The patient has fair insight and poor judgment." R. at 287.

Dr. Koneru recommended that Plaintiff take Lamicatal for her mood swings; Risperdal for her paranoia, sleep problems, and anger problems; and continue therapy at the Westlund clinic. R. at 287.

**5**

September 2009. Following Dr. Koneru's advice, Plaintiff continued seeing a therapist at the Westlund clinic. R. at 303. On September 24, Plaintiff had an appointment. R. at 303. "She had her gall bladder out," Plaintiff's therapist noted, further recording that Plaintiff was "fatigued." R. at 303. The therapist explained to Plaintiff that her surgery "was only two weeks

ago.  Told her she's still healing.  Talked to her about taking better care of herself rather than doing everything for everyone."  R. at 303.

## 6

October 2009.  Plaintiff saw a therapist, who reported that Plaintiff's mental status as "open [and] calm."  R. at 301.  Plaintiff discussed the difficulties that she was having with her doctor and her son's doctor.  R. at 301.  She also disclosed her plan to go back to school.  R. at 301.  Under "progress," the therapist recorded "vented about . . . health care" and "[b]etter sleep and less anger."  R. at 301.

## 7

November 2009.  Plaintiff saw her therapist, who reported that Plaintiff is "ready to take her GED test, but she's afraid of failure.  Told her about the irrationality of believing that she must succeed at everything."  R. at 299 (capitalization omitted).  Plaintiff also reported that she "had a small altercation at school, [but] she contained her temper.  She says she is handling anger better now."  R. at 299.

## 8

December 2009.  Plaintiff told her therapist that she "was doing pretty good for a while.  She starting going to bingo [with] her mom."  R. at 297.  But then an incident had occurred.  R. at 297.

Plaintiff explained that her mother had previously "lost her bingo friend over sharing winnings.  The ex-friend's daughter started coming.  Her sister started going.  Yesterday, those friends started griping [and Plaintiff] 'blew a fuse' and her sister joined in.  [Plaintiff told] them that she doesn't like them [and] she is tired of them.  They told [her] to shut up and they know

where she lives.  [Plaintiff] told them she is not going to run.  They went outside.  Now she feels guilty."  R. at 297.

The therapist responded by teaching Plaintiff "better communication skills."  R. at 297.

**9**

February 2010.  Plaintiff saw her therapist, who reported that Plaintiff "is looking for work.  I downloaded a census taker application."  R. at 294.  Plaintiff also disclosed that "she feels like she should be perfect.  But she gives [and] gives [and] it's never enough."  R. at 294.  The therapist addressed this by discussing Plaintiff's "obsession" with perfection.  R. at 294.

**10**

After this session, several months passed without Plaintiff seeing her therapist.  *See* R. at 289–91.

**11**

June 2010.  Plaintiff returned to therapy, explaining that she "hasn't had a vehicle and [only recently] got it fixed."  R. at 289.  Plaintiff then went on to vent her "anger [and] disappointment over police 'unjustly' stopping her."  R. at 289.

Plaintiff explained that although she had her car repaired, "she got stopped by police on the way here."  R. at 289.  After being stopped, Plaintiff learned that her license had been suspended for an unpaid ticket.  R. at 289.  (It is unclear whether this is the same ticket that Plaintiff received in October 2008.)  Plaintiff complained that the state had "never notified [her] that her license was suspended [or] that she owed the money on the first [ticket]."  R. at 289.  Plaintiff further reported that the officer "made her get a ride or she was going to jail.  [The officer] searched her car.  He towed her car away.  He didn't ask for permission to search her car.  She has to appear in 14 days."  R. at 289.

Addressing the situation, Plaintiff "promised to keep her anger under control."  R. at 289.
Plaintiff also reported that she "is ready to take her GED, but no longer has the $115.00."  R. at
289.  The therapist worked with Plaintiff on "[h]andling distress calmly."  R. at 289.

**12**

This was the last documented visit to the Westlund Guidance Clinic contained in the
record.

**D**

**1**

Plaintiff's request for disability benefits was initially denied by the Commissioner in
April 2009.  R. at 48–55.  "If you disagree with this determination," the notice provided, "you
have the right to request a hearing."  R. at 54.  The notice also described how the hearing process
worked.  R. at 54.  And it notified Plaintiff of her right to representation, providing: "You can
have a lawyer, friend, or someone else to help you.  There are groups that can help you find a
lawyer who do not charge unless you win your appeal.  Your Social Security office has a list of
these groups."  R. at 55.

Plaintiff requested a hearing.  R. at 56.  Explaining in her request for a hearing that she
disagreed with the Commissioner, Plaintiff wrote that she is unable to work for three reasons: (1)
"depress[ion]"; (2) "head hurt"; and (3) "argue problem."  R. at 56 (capitalization omitted).

Plaintiff also acknowledged in her request for a hearing that "I understand I have a right
to be represented and that if I need representation, the social security office or hearing office can
give me a list of legal referral and service organizations to assist me in locating a representative."
R. at 57 (capitalization omitted).

**2**

Plaintiff received confirmation of her hearing.  R. at 59.  That confirmation likewise notified Plaintiff of her right to representation, explaining: "You may choose to be represented at the hearing by a lawyer or other person. . . .  If you decide to have a representative, you should find one immediately so that he or she can start preparing your case.  Some private lawyers charge a fee only if you receive benefits.  Some organizations may be able to represent you free of charge.  Your representative may not charge you a fee unless we approve it.  We have enclosed the leaflet 'Social Security and Your Right to Representation.'  We are also enclosing a list of groups that can help you find a representative."  R. at 59–60 (paragraph breaks omitted).

Plaintiff received notice of the hearing in June 2010.  R. at 75–80.  Again, the notice informed Plaintiff of her right to representation at the hearing and enclosed the leaflet "Social Security and Your Right to Representation."  R. at 77, 82–84. The hearing was scheduled for August 2010.  R. at 75.

**3**

Plaintiff, evidently, sought out representation.  *See* R. at 100.  In July 2010, an attorney with the Legal Services of Eastern Michigan faxed the Commissioner.  R. at 100.  "We are investigating [Plaintiff's] SSI case for possible representation," the fax explained, continuing: "I would like to request a copy of the CD for [Plaintiff's] case. . . .  I have attached a release allowing you to provide me this disk."  R. at 100.

**4**

Plaintiff appeared at the hearing in August.  *See* R. at 31.  She was not represented by counsel, but asked for an extension to do so.  *See* R. at 31.

Defendant agreed to postpone the hearing to permit Plaintiff time to find a representative and have that person familiarize himself or herself with the case.  *See* R. at 11, 31, 101.  The hearing was continued about four months, to December 8, 2010.  R. at 101.

Again, Plaintiff received notice of the hearing.  R. at 101–06.  And again the notice informed Plaintiff of her right to representation at the hearing and enclosed the leaflet "Social Security and Your Right to Representation."  R. at 103, 108–09.

### E

On December 8, 2011, a video hearing was held before Administrative Law Judge Troy Patterson.  R. at 11.  As the hearing began, Judge Patterson and Plaintiff had the following discussion:

| Judge: | Now, Ms. Thomas, you were here earlier in August . . . and at that time you asked to get a representative and I allowed you to do so. And so we're here again today.  I see that you do not have someone to represent you. |
|---|---|
| Plaintiff: | No, I don't. Mr. Lee Church said he was going to represent me but he's not here.  He was asking for a jury but if we have to [go] on, I'll just go on. |
| Judge: | Yes ma'am, we do.  We've already given you the opportunity to get one and it's been four months so we need to move on. |
| Plaintiff: | Okay. |

R. at 31.  Judge Patterson then proceeded to question Plaintiff.

### 1

Plaintiff was first asked about her education.  R. at 33.  She explained that she had attended high school until the tenth grade, but was also going to get her GED.  R. at 33.  She elaborated that she was scheduled to begin GED classes in January (the month after the hearing). R. at 33.

-16-

Turning to the medical problems that kept her from working, Plaintiff identified three: "Anxiety, depression, bipolar."  R. at 34.  Inquiring further, Judge Patterson asked:

| | |
|---|---|
| Judge: | Well, let's start with the one that is the most serious and the most disabling in your mind? |
| Plaintiff: | The depression. |
| Judge: | Okay.  Tell me about it.  How long have you been depressed? |
| Plaintiff: | Off and on for about two or three years now. |
| Judge: | Is there anything that triggered the depression? |
| Plaintiff: | Just my life, yeah and I had a lot of tragedy going on in my life. |
| Judge: | Okay.  Did you seek treatment for it? |
| Plaintiff: | Yes, I go to Westland Guidance Center. |
| Judge: | Okay.  And how long have you been going there? |
| Plaintiff: | For a year. |
| Judge: | What do they do for you there? |
| Plaintiff: | I see counseling there. |
| Judge: | Okay.  Do you just talk to someone? |
| Plaintiff: | Yes. |
| Judge: | Do they give you any medication? |
| Plaintiff: | Yes. |

R. at 34.  After identifying Plaintiff's medications, Judge Patterson continued:

| | |
|---|---|
| Judge: | Okay.  And do they help? |
| Plaintiff: | Yeah, yes. |
| Judge: | Do they cause any side effects? |

| | |
|---|---|
| Plaintiff: | Like you get dry at the mouth.  Sometimes it makes your stomach and stuff hurt.  But other than that they [are] all right. |
| Judge: | Okay.   You talked about depression and then you mentioned anxiety.  You have anxiety as well? |
| Plaintiff: | Yes. |
| Judge: | And do they treat you for that at the Westlund Guidance Center? |
| Plaintiff: | Yes. |
| Judge: | Okay.  Any other problems? |
| Plaintiff: | I'm bipolar. |
| Judge: | Okay.  You talked about being depressed.  Do you have any manic episodes? |
| Plaintiff: | What are those? |
| Judge: | You know when you get real hyper and do things and you feel real good and you might spend a lot of money or not sleep for a long time. |
| Plaintiff: | I don't spend a lot of money but I do go days on without sleeping and sometimes I just in a room by myself and have the lights cut off but I don't spend money and stuff like that.  I don't have none to spend. |

R. at 35–36.  When Judge Patterson inquired further of Plaintiff's symptoms, Plaintiff testified

that "I just can't be around a lot of people for a long period of time.  I'm not capable of doing

certain things . . . .  Like I can't read big words and understand.  People have to tell me what's

going on and have things done right there.  They have to show me how to do stuff, like hands on

stuff.  You can't just put me out there and think I [am] supposed to know."  R. at 41–42.

After inquiring into Plaintiff's claimed disabilities, symptoms, and treatments, Judge

Patterson turned the conversation to Plaintiff's daily activities:

| | |
|---|---|
| Judge: | And what do you do during the day? |
| Plaintiff: | Other than trying to go to school, nothing. |
| Judge: | I mean do you help your mom with the household chores? |
| Plaintiff: | Yeah if I can but most of the time no.  She drives me around and stuff. |
| Judge: | Well, I mean things like washing the dishes, vacuuming, dusting, making the beds, cooking.  You don't do any of that? |
| Plaintiff: | No. |
| Judge: | Why not? |
| Plaintiff: | Because she helps me do it for me.  I can't — Like doing directions, I have to have somebody show me how to do it.  Like getting here, she drove us here.  I can't read the directions. . . . |
| Judge: | Okay.  Do you have a driver's license? |
| Plaintiff: | Yeah, I have one but I don't use it. |
| Judge: | You don't drive.  When was the last time you drove? |
| Plaintiff: | About a year ago. |
| Judge: | Why don't you drive[?] |
| Plaintiff: | I just don't.  I'm scared. |
| Judge: | You're scared?  You are scared you are going to have a wreck? |
| Plaintiff: | That too.  I've been in a lot of accidents and I don't like to drive. |
| Judge: | Well, do you do anything outside the house?  I mean do you go shopping with your mother? |
| Plaintiff: | Yes, I go with her. |
| Judge: | Okay.  Do you go to church? |
| Plaintiff: | Sometimes. . . . |
| Judge: | Okay.  Do you all go out to eat, go to the mall?  Go to the movies? |

| | | |
|---|---|---|
| Plaintiff: | Yes. | |
| Judge: | Sometimes? | |
| Plaintiff: | Yes. . . . . | |
| Judge: | Do you read, watch TV? | |
| Plaintiff: | I watch TV. | |
| Judge: | What kind of programs? | |
| Plaintiff: | I like action movies. | |
| Judge: | Do you read the newspaper, magazines? | |
| Plaintiff: | I read the newspaper sometimes. | |
| Judge: | You talked about getting ready to go back to school.  What have you done to prepare yourself for that? | |
| Plaintiff: | Like [what] you [were] talking about.  I went and applied to go back to school. | |

R. at 36–38.  Plaintiff then explained that she went to a high school and completed "applications to go back to school."  R. at 39.

The conversation then turned to Plaintiff's work history.  Plaintiff testified that she last worked in 2003 "checking zip lock bags."  R. at 39.  Plaintiff explained that she quit because it was "too stressful."  R. at 40.  Asked to explain, Plaintiff recalled that "you have to be there twelve hours just sitting there — Just sitting there, watching.  You don't do nothing else, just sit there and watch."  R. at 40.  Judge Patterson inquired:

| | |
|---|---|
| Judge: | So, how was that too stressful for you? |
| Plaintiff: | Cause you are sitting there.  There's nothing to do actually. |
| Judge: | Well, to me [it] doesn't sound stressful.  It sounds like it is boring? |
| Plaintiff: | That too. . . . |

| | |
|---|---|
| Judge: | [Didn't you tell the consulting psychologist] that you thought the job was good.  That you got to work by yourself and the only reason you quit working there was because the agency downsized.  Is that accurate? |
| Plaintiff: | Yes. |

R. at 40–41.  Plaintiff further reported that she had not looked for work or applied for unemployment benefits.  R. at 41.  The conversation then turned to Plaintiff's son:

| | |
|---|---|
| Judge: | And you have a son, is that correct? |
| Plaintiff: | Yes, I do.  Yes, I do. |
| Judge: | How old is he? |
| Plaintiff: | He's 15. |
| Judge: | Now, does he live with you? |
| Plaintiff: | Yes. |
| Judge: | So, what do you do with him?  Do you take him to school?  Or do you go out and take him places?  Or go to the school for school activities?  Anything like that? |
| Plaintiff: | I interact with him. |
| Judge: | Do you ever have to go to school for like PTA meetings or when he has a teacher conference? . . . |
| Plaintiff: | My mother goes for me. |
| Judge: | And why don't you go? |
| Plaintiff: | I go sometimes. |

R. at 42.  Judge Patterson concluded by again inquiring about Plaintiff's claims, asking: "Ms. Thomas, is there anything else wrong with you that you want to tell me or talk to me about?"  R. at 42.  "No," Plaintiff answered.  R. at 42.  "Alright then, if you'll just be patient I am going to

ask Ms. Tremblay a few questions and then [when] I finish talking to her I'll talk to you again." R. at 43.

## 2

Judge Patterson then questioned the vocational expert, Ann Tremblay. She was asked to assume that a hypothetical person shares Plaintiff's age, education, and vocational experience and would need to be restricted to jobs "involving only superficial . . . personal contact with co-workers and the public and simple routine tasks." R. at 43. With these assumptions, Ms. Tremblay was asked whether the hypothetical person was capable of performing Plaintiff's past work. R. at 42. Ms. Tremblay concluded that "it is questionable." R. at 44.

Following up, Judge Patterson asked whether the hypothetical person was capable of performing a significant number of jobs in the regional or national economy. R. at 62. "Sure," Ms. Tremblay answered, identifying: (1) food preparation worker (5,500 available jobs in Michigan; 171,000 jobs nationally); (2) dishwasher (8,500 available jobs in Michigan; 277,000 jobs nationally); and (3) packer (9,500 available jobs in Michigan; 315,000 jobs nationally). R. at 44.

Changing the hypothetical, Judge Patterson asked Ms. Tremblay to assume a person with the same limitations, but who would also "be off task twenty five percent more often during the work day than an unimpaired individual would be for that same time period." R. at 44. Ms. Trembly responded that such person would be unable to perform "the claimant's past work or any other work." R. at 44.

**3**

Before concluding the hearing, Judge Patterson again asked Plaintiff: "Ms. Thomas, have you thought of anything else that you would like me to know?"  R. at 45.  Plaintiff answered: "No, thank you."  R. at 45.

**II**

**A**

The Commissioner's decision is made according to a five-step process.  20 C.F.R. § 404.1520(a)(4)(i)–(v).  A claim is allowed when it is demonstrated that: (1) the claimant is not engaged in "substantial gainful employment"; (2) the claimant suffers from a severe impairment which has lasted or is expected to last for twelve continuous months; (3) the impairment meets or is equal to one of the enumerated impairments; (4) the claimant does not retain the "residual functional capacity" to perform his "past relevant work"; and (5) the claimant is unable to perform any other gainful employment in light of the claimant's "residual functional capacity, age, education, and work experience."  20 C.F.R. § 416.920(a)(4)(i)–(v).

The claimant has the burden of proof through the first four steps.  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 C.F.R. § 404.1520 (1982)).  If the analysis reaches the fifth step, the burden transfers to the Commissioner.  *Id.*

**B**

In March 2012, Judge Patterson issued a decision denying Plaintiff's application for disability benefits.  R. at 8–25.

### 1

Applying the five-step process, at step one Judge Patterson concluded that Plaintiff had not engaged in "substantial gainful employment" since the alleged onset date of July 1, 2007.  R. at 13.

### 2

At step two, Judge Patterson found that Plaintiff had two "severe impairments: depression and bipolar disorder."  R. at 13.

### 3

At step three, Judge Patterson found that Plaintiff's combination of impairments did not meet or equal one of the impairments listed in the regulations.  R. at 14.  In making this finding, Judge Patterson explained that he had "considered whether the 'paragraph B' criteria are satisfied."[2]  R. at 14.

Elaborating, Judge Patterson explained that he found that Plaintiff has "mild" restrictions in the activities of daily living.  R. at 14.  The judge noted that she "admitted that she can occasionally help her mother with chores, that she can go shopping with others, and that she is able to drive.  The record also shows that she takes her son to and from school, and that she watches television, listens to music, and occasionally reads."  R. at 14.

Judge Patterson next found that Plaintiff has "moderate" restrictions in maintaining social functioning.  R. at 14.  The judge observed that although Plaintiff reported "that she does not like other people," she also told the "consultative examiner that she has a good relationship with her son and some of her siblings. . . .  The claimant also noted that she enjoys going to her son's

---

[2] "Paragraph B criteria" are "a set of impairment-related functional limitations" enumerated in 20 CFR part 404, subpart P, appendix 1, § 12.00.  These criteria are: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration."  20 C.F.R. part 404, subpart P, app. 1, §§ 12.04(B)(1)–(4), 12.06(B)(1)–(4).

sporting events and testified that she sometimes goes to church or goes out to eat with her mother.  She also admitted that she was close to her mother and a good caregiver."  R. at 15.

Turning to Plaintiff's concentration, persistence, and pace, Judge Patterson again found Plaintiff had "moderate difficulties."  R. at 15.  Discounting Plaintiff's account of the extent of her limitations, however, Judge Patterson noted that Plaintiff "has sufficient concentration to watch television, watch movies, listen to music, and read.  The record also shows that she had an intact memory and that she had sufficient focus to do simple calculations.  State agency examiner Ron Marshall, Ph.D. noted that the claimant was not significantly limited in any part of understanding and memory.  Moreover, the consultive examiner determined that the claimant had no significant intellectual limitations."  R. at 15.

Finally, Judge Patterson noted that Plaintiff had experienced no episodes of decompensation.  R. at 15.  Thus, Judge Patterson concluded that Plaintiff satisfied the "paragraph B" criteria.  R. at  15.[3]

**4**

Between steps three and four, Judge Patterson found Plaintiff had "The residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  She would need to be restricted to jobs involving only superficial interpersonal contact with coworkers and the public, and she is limited to simple, routine, and repetitive tasks."  R. at 15.

In formulating this assessment, Judge Patterson gave the opinion of consulting examiner Dr. Natalie Menendes "some weight," finding that it was "partly consistent with the evidence as a whole."  R. at 19.  Judge Patterson noted that Dr. Menendes had concluded "Plaintiff could

---

[3] Judge Patterson also concluded that Plaintiff's condition did not satisfy "paragraph C" criteria.  R. at 15; *see* 20 C.F.R. part 404, subpart P, app. 1, §§ 12.04(C), 12.06(C).

perform and remember simple, routine, and repetitive tangible tasks, but may have difficulty with performing complex or multi-step tasks, making independent work related decisions, or engaging in abstract thinking and work that is not routine." R. at 19.

Judge Patterson gave the opinion of state examiner Dr. Ron Marshall more weight, finding that it was "mostly consistent with the evidence as a whole." R. at 20. That gentleman, Judge Patterson observed, had "opined that the claimant retains the ability to do rote tasks and to follow at least simple instructions. He also determined that she may have difficulty with complex tasks and that she may work better with minimal contact with the public." R. at 19.

**5**

At step four, Judge Patterson concluded that Plaintiff "is capable of performing past relevant work as a production worker and stock position." R. at 20.

**6**

Alternatively, at step five Judge Patterson concluded that "there are other jobs that exist in significant numbers in the national economy that the claimant can also perform." R. at 20.

Thus, Judge Patterson concluded, Plaintiff was not disabled. R. at 21.

**C**

Plaintiff requested a review by the appeals council. *See* R. at 7. The council declined to review Judge Patterson's decision. R. at 1–6. This appeal followed.

**D**

In December 2011, Plaintiff filed suit in this Court. The case was referred to Judge Hluchaniuk pursuant to 28 U.S.C. § 636. Plaintiff filed a motion for summary judgment. Defendant then also moved for summary judgment.

In February 2013, Judge Hluchaniuk issued a report recommending that the Court deny Plaintiff's motion, grant Defendant's motion, and affirm Judge Patterson's decision.

Plaintiff filed objections to the report and recommendation.

### III

### A

The district court "shall make a de novo determination of those portions of the report . . . to which objection is made." *Id*. The Court is not obligated to further review the portions of the report to which no objection was made. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

The Court reviews the Commissioner's decision to determine whether the "factual findings . . . are supported by substantial evidence." *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) (citing 28 U.S.C. § 405(g)). "Substantial evidence," the Sixth Circuit instructs, "is more than a scintilla of evidence but less than a preponderance." *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). That is, it "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The Sixth Circuit also cautions that the Commissioner's "findings based on the credibility of the applicant are to be accorded great weight and deference." *Walters v. Comm'r.*, 127 F.3d 525, 531 (6th Cir. 1997). If the Commissioner's decision (including the assessment of the claimant's credibility) is supported by substantial evidence, it must be affirmed, even if substantial evidence supports the opposite conclusion. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

**B**

Plaintiff enumerates four objections to the report and recommendation. Each is addressed in turn.

**1**

Plaintiff first objects that the opinion of Dr. Menendes was not "fairly reflected" by either Judge Patterson or Judge Hluchaniuk. Pl.'s Objections 1. Plaintiff elaborates:

> Dr. Menendes did not only conclude that the Plaintiff retained the ability to perform simple, routine, and repetitive tasks, as contended by the Magistrate Judge; but additionally and more significantly, Dr. Menendes concluded that Plaintiff was limited to "understanding, retaining, and following simple and one step instructions," and would have difficulty with "multi-step tasks." . . .

> The Report and Recommendation makes clear that the Magistrate Judge did not consider the major discrepancy between Dr. Menendes' opinion and the RFC determination. The Magistrate Judge properly cites to Plaintiff's argument that "Dr. Menendes opined that Plaintiff 'is able to understand, retain, and follow simple and one step instructions," however, the Magistrate Judge does not see the difference between Dr. Menendes' conclusion and the RFC determination, finding Plaintiff capable of "simple, routine, repetitive work." The significant difference is Dr. Menendes' opined limitation to "one step instructions."

> . . .

> The mere fact that the ALJ's hypothetical questioning and RFC determination allowed for "tasks" — plural — reveals that the ALJ did not fairly reflect Dr. Menendes' opinion that the Plaintiff would be limited to a job with "one step instructions" — singular. The failure to fairly reflect an expert medical opinion relied upon by the ALJ is reversible error.

*Id.* at 2, 4 (brackets and internal citations omitted) (quoting Report and Recommendation 21; R. at 249) (citing *Ealy v. Comm'r of Soc. Sec*, 594 F. 3d 504 (6th Cir. 2010)).

Plaintiff's objection lacks merit.

**a**

First, Dr. Menendes did not expressly limit Plaintiff to the simplest tasks involving no more than "one step instructions." Rather, Dr. Menendes cautioned that Plaintiff "*may* have

difficulty with performing complex or multi-step tasks." R. at 249 (emphasis supplied). She further found that Plaintiff "is able to understand, retain, and follow simple and one step instructions. She is able to perform and remember simple, routine, and repetitive tangible tasks. *She does not appear to have any significant intellectual limitations*." R. at 249 (emphasis supplied).

"Tasks," plural. In other words, Dr. Menendes concluded that Plaintiff can do more than one thing. And Plaintiff, Dr. Menendes further concluded, "does not appear to have any significant intellectual limitations." Though self-evident, it bears spelling out: The inability to perform any task involving more than "one step instructions" is a significant intellectual limitation.

Judge Patterson, in turn, concluded that Plaintiff is able to perform "simple, routine, and repetitive tasks." R. at 15. This residual functional capacity assessment mirrors that of Dr. Menendes (who, as noted, found that Plaintiff "is able to perform . . . simple, routine, and repetitive . . . tasks" and "does not appear to have any significant intellectual limitations").

Because Judge Patterson's residual functional capacity determination fairly reflects Dr. Menendes's opinion, Plaintiff's first objection lacks merit.

**b**

Moreover, to the extent that Judge Patterson's decision is inconsistent with Dr. Menendes's opinion,[4] the decision is supported by substantial evidence.

---

[4] As an aside, it is by no means obvious that Dr. Menendes concluded that Plaintiff was actually limited to "one step instructions." As noted, Dr. Menendes concluded that Plaintiff could follow such instructions, but may have difficulty with "complex or multi-step tasks." R. at 249. Yet she also concluded that Plaintiff did not have "any significant intellectual limitations." R. at 249. To reiterate, the inability to perform any task involving more than "one step instructions" is a significant intellectual limitation.

The Code of Federal Regulations, the Sixth Circuit observes, establishes "a presumptive sliding scale of deference to be given to various types of opinions." *Norris v. Comm'r of Soc. Sec*, 461 F. App'x 433, 439 (6th Cir. 2012) (citing 20 C.F.R. §§ 404.1527(d), 416.927).

At one pole is the opinion of a treating physician, which is "accorded the most deference" due to the "ongoing treatment relationship between the patient and the opining physician." *Id.* (quotation marks omitted) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)).

A non-treating source like Dr. Menendes "who physically examines the patient but does not have, or did not have an ongoing treatment relationship with the patient, falls next along the continuum." *Norris*, 461 F. App'x at 439 (citing *Smith*, 482 F.3d at 875).

And a nonexamining source, such as Dr. Marshall, "who provides an opinion based solely on review of the patient's existing medical records, is afforded the least deference." *Norris*, 461 F. App'x at 439 (citing *Smith*, 482 F.3d at 875). But, the Sixth Circuit cautions,

> [I]t is not a *per se* error of law . . . for the ALJ to credit a nonexamining source over a nontreating source. Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record.

*Norris*, 461 F. App'x at 439 (citing 20 C.F.R. §§ 404.1527, 416.927; *Ealy*, 594 F.3d at 514).

"Moreover," the Sixth Circuit notes, "an ALJ need only explain its reasons for rejecting a treating source because such an opinion carries 'controlling weight.'" *Norris*, 461 F. App'x at 439 (citing *Smith*, 482 F.3d at 876). Put differently, an administrative law judge need not give reasons for not accepting the report of a non-treating physician, like Dr. Menendes. *See Smith*, 482 F.3d at 876.

Dr. Menendes, as noted, was not a treating source. So Judge Patterson was under no obligation to explain why he accorded Dr. Menendes's opinion only "some weight."

Nevertheless, Judge Patterson detailed a number of reasons why he concluded Plaintiff was not limited to "one step instructions."[5]

Reviewing the record, Judge Patterson observed that Plaintiff "can complete most personal care activities and that she had a driver's license. Although the claimant reports that she is highly dependent on other people for help, the medical evidence shows that she is a good caregiver. In fact, she informed therapists that one of her major stressors was being used by her family and that she saw herself as a caregiver to all of them." R. at 18.

Continuing, Judge Patterson noted that Plaintiff had asserted that "she could not handle her finances and that she needed help shopping in stores because she had problems reading. However, she testified that she sometimes reads newspapers and informed the consultative examiner that she sometimes reads. Moreover, the consultative examiner's notes show that [Plaintiff] left school due to pregnancy and that she was never enrolled in special education classes." R. at 19.

Judge Patterson further noted that Plaintiff "admitted that she watches television, likes action movies, and occasionally reads. She also goes shopping, occasionally eats out, periodically goes to the mall, and . . . sometimes goes to school conferences and meetings." R. at 19.

To summarize, Plaintiff cared for herself, her son, and her family. She drove,[6] shopped, and did chores. She went to the movies, the mall, and parent-teacher conferences. She read, kept a journal, and even enrolled in classes to get her GED.

---

[5] To the extent Dr. Menendes actually concluded that Plaintiff would have "difficulty" if presented with anything more than "one step instructions" — which is Plaintiff's interpretation, but by no means obvious — her findings are inconsistent. As the reader is doubtless aware at this juncture, she also found that Plaintiff did not have "any significant intellectual limitations." And as there is substantial evidence in the record that Plaintiff was capable of performing a range of tasks that require more than "one step instructions" (e.g., driving, reading, caring for a teenage son), Judge Patterson not crediting this alleged limitation would be entirely reasonable.

Substantial evidence supports Judge Patterson's finding that Plaintiff had the residual functional capacity to perform "simple, routine, and repetitive tasks."  R. at 15.

Plaintiff's first objection will be overruled.

## 2

Plaintiff next objects that she was "denied a full and fair hearing."  Pl.'s Objections 4. Elaborating, Plaintiff makes two related sub-objections.  First, she claims that she was denied her right to representation, explaining: "There is simply no evidence of record that demonstrates that the Plaintiff was ever made aware of or understood that she had a right to representation. Although there are forms contained in the record that describe a Social Security claimant's right to representation, there is simply no evidence that the Plaintiff received or understood such paperwork."  *Id*. at 5.

Second and similarly, Plaintiff asserts that she "was denied the right to cross-examine the Vocational Expert, whose evidence the ALJ relied upon in making his determination.  During the hearing the ALJ told the Plaintiff to be 'patient' while he questioned the Vocational Expert. . . . The ALJ provided no opportunity for the Plaintiff to cross-examine the Vocational Expert and instead closed the hearing."  *Id*. at 6.

Plaintiff's arguments lack merit.

## a

"Social Security proceedings," as noted, "are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)).

---

[6] Whether she was licensed to do so after June 2010 is not clear from the record.  What is clear is that by Plaintiff's own admission she was driving as recently as six months before the hearing.  *See* R. at 289 (discussed above).

The administrative law judge has a "special, heightened duty to develop the record," moreover, "when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (citing *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 856 (6th Cir.1986)).

"To satisfy this special duty," the Sixth Circuit instructs, "the administrative law judge must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1983) (quotation marks omitted) (quoting *Gold v. Sec'y of Health, Educ. and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

In *Lashley*, for example, the plaintiff, an unrepresented seventy-nine-year-old stroke victim with a fifth grade education, displayed evident confusion and ineffective presentation of his case before the administrative law judge. 708 F.2d at 1052. The Sixth Circuit concluded that the administrative law judge had not fulfilled his obligation to develop the record. *Id*. Illustrating the inadequacy of the judge's investigation, the court reproduced the following exchange between the administrative law judge and the plaintiff:

> Judge:       What do you do in the yard?
>
> Plaintiff:   I try to mow the yard.
>
> Judge:       Do you use a riding mower or push mower?
>
> Plaintiff:   I tried to ride a riding mower but it hurts my head worser than the push mower.
>
> Judge:       You usually use a push mower?
>
> Plaintiff:   Yes, sir.

*Id.*  From this, the administrative law judge inferred "that plaintiff is a vigorous man who prefers a push mower to a power mower."  *Id.*  Rejecting this finding, the Sixth Circuit wrote: "This inference, however, appears to be unfounded.  More probing questioning concerning how often the activity is attempted, how long he is capable of sustaining the activity, and what adverse consequences he suffers as a result of the activity would undoubtedly have provided more probative information concerning his physical limitations."  *Id.*

In this case, unlike in *Lashley*, Judge Patterson thoroughly explored the facts and circumstances of Plaintiff's claim, eliciting responses that accurately portrayed the extent of her limitations.  (Indeed, in her second objection the plaintiff identifies no medical evidence that the judge did not elicit or consider.)  Regarding Plaintiff's daily activities, for example, Judge Patterson asked:

> Judge:      And what do you do during the day?
>
> Plaintiff:  Other than trying to go to school, nothing.
>
> Judge:      I mean do you help your mom with the household chores?
>
> Plaintiff:  Yeah if I can but most of the time no.  She drives me around and stuff.
>
> Judge:      Well, I mean things like washing the dishes, vacuuming, dusting, making the beds, cooking.  You don't do any of that?
>
> Plaintiff:  No.
>
> Judge:      Why not?
>
> Plaintiff:  Because she helps me do it for me.  I can't — Like doing directions, I have to have somebody show me how to do it.  Like getting here, she drove us here.  I can't read the directions. . . .
>
> Judge:      Okay.  Do you have a driver's license?
>
> Plaintiff:  Yeah, I have one but I don't use it.

-34-

Judge:          You don't drive.  When was the last time you drove?

Plaintiff:      About a year ago.

Judge:          Why don't you drive[?]

Plaintiff:      I just don't.  I'm scared.

Judge:          You're scared?  You are scared you are going to have a wreck?

Plaintiff:      That too.  I've been in a lot of accidents and I don't like to drive.

Judge:          Well, do you do anything outside the house?  I mean do you go shopping with your mother?

Plaintiff:      Yes, I go with her.

Judge:          Okay.  Do you go to church?

Plaintiff:      Sometimes. . . .

Judge:          Okay.  Do you all go out to eat, go to the mall?  Go to the movies?

Plaintiff:      Yes.

Judge:          Sometimes?

Plaintiff:      Yes. . . . .

Judge:          Do you read, watch TV?

Plaintiff:      I watch TV.

Judge:          What kind of programs?

Plaintiff:      I like action movies.

Judge:          Do you read the newspaper, magazines?

Plaintiff:      I read the newspaper sometimes.

Judge:          You talked about getting ready to go back to school.  What have you done to prepare yourself for that?

Plaintiff:      Like [what] you [were] talking about.  I went and applied to go back to school.

R. at 36–38.  Plaintiff then elaborated that she went to a high school and completed "applications to go back to school."  R. at 39.[7]

From this testimony, and the record as a whole, Judge Patterson found that Plaintiff that Plaintiff has "mild" restrictions in the activities of daily living.  R. at 14.  The judge noted that she "admitted that she can occasionally help her mother with chores, that she can go shopping with others, and that she is able to drive.  The record also shows that she takes her son to and from school, and that she watches television, listens to music, and occasionally reads."  R. at 14.

Not only is this finding supported by substantial evidence, it illustrates the manner in which Judge Patterson scrupulously and conscientiously explored all the relevant facts before reaching his decision.

Plaintiff's objection that Judge Patterson did not fully and fairly develop the record will be overruled.

**b**

Because Judge Patterson fulfilled his duty to fully and fairly develop the record, Plaintiff is not entitled to a remand based on the alleged ineffective waiver of counsel. *See Thomas v. Barnhart*, 54 F. App'x 873, 878 (7th Cir. 2003) ("[E]ven when [a] waiver of counsel is invalid, a claimant is not entitled to a remand unless the ALJ failed in his duty to fully and fairly develop the record.").

And, although not necessary to the decision, the Court notes that it is by no means apparent that Plaintiff is correct that her waiver of counsel was ineffective.  *Cf. Thomas*, 54 F. App'x 873, 877 (7th Cir. 2003) ("This right can be waived if the ALJ provides the claimant with sufficient information to make such a waiver knowingly and intelligently."  (citing *Thompson v.*

---

[7] At multiple points during the hearing, Judge Patterson also asked Plaintiff "have you thought of anything else that you would like me to know?"  R. at 45; *see also* R. at 42 (quoted above).)

-36-

*Sullivan*, 933 F.2d 581, 584 (7th Cir.1991)).  What is obvious is that Plaintiff both "received" and "understood" her right to representation.  *See* Pl.'s Objections 5 (quoted above).

First, Plaintiff had actual notice of her right to representation.  *See* 42 U.S.C. § 406; *Lamay v. Comm'r of Soc. Sec*., 562 F.3d 503, 507 (2d Cir. 2009) (discussing § 406).  She acknowledged as much, both in writing and in person.  *See* R. at 31, 57 (quoted above).

And she understood that right — indeed, she repeatedly exercised it.  Before the first scheduled hearing, she evidently sought representation with the Legal Services of Eastern Michigan.  R. at 100.  And at that hearing, she asked for a continuance to retain representation. R. at 31 (quoted above).  Judge Patterson granted the request and continued the hearing for four months to permit Plaintiff time to find a representative.  See R. at 11, 101.

When Plaintiff again appeared without counsel, Judge Patterson could have reasonably concluded that by not securing counsel within the four month extension, Plaintiff had waived her right to do so.  As the Ninth Circuit recently observed in a related context:

> A respondent in immigration proceedings has a Fifth Amendment right to counsel . . . .  This is not to imply an alien can "game the system" and postpone deportation proceedings indefinitely simply by not obtaining counsel and refusing to waive his right to counsel. After waiting "a reasonable period for obtaining counsel," the IJ can proceed even though the alien is not represented.

*United States v. Cisneros-Flores*, 467 F. App'x 634, 637 (9th Cir. 2012).  Moreover, the Court reiterates, it notes this only in passing.

Because Judge Patterson fulfilled his duty to fully and fairly develop the record, Plaintiff is not entitled to a remand based on the purported ineffective waiver of counsel.  *Thomas*, 54 F. App'x at 878.

**c**

Similarly unpersuasive is Plaintiff's argument her due process rights were violated because Judge Patterson "provided no opportunity for the Plaintiff to cross-examine the Vocational Expert and instead closed the hearing."  Pl.'s Objection 6.

As a threshold matter, Plaintiff is correct that as a general matter "due process requires that a claimant be given the right to cross-examine individuals who testify."  Pl.'s Objections 6 (quoting *Butler v. Comm'r of Soc. Sec.*, 114 F.3d 1186, at *4 (6th Cir. 1997) (unpublished table op.)).

And, in general, "the administrative law judge should, as a matter of courtesy and fairness, ask an unrepresented claimant if he has any questions he wishes to ask of a witness." *Figueroa v. Sec'y of Health, Ed. & Welfare*, 585 F.2d 551, 554 (1st Cir. 1978).  But the majority of circuits agree that "the administrative law judge does not have an absolute duty to advise an unrepresented claimant of his right to cross-examine and . . . we would seldom regard this omission as by itself reason for remand."  *Id.*; *accord Jacobs v. Shalala*, 997 F.2d 880, at *5 (5th Cir. 1993) (per curiam) (unpublished table op.).  (The Sixth Circuit has not addressed the issue.)

In *Figueroa*, for example, the claimant asserted that "he was denied an effective opportunity to cross-examine the vocational expert" because "he did not know of, and what was not told of, his right to cross-examine."  585 F.2d at 554.  The First Circuit rejected this argument, noting that the claimant "made no request to cross-examine" and that "the administrative law judge does not have an absolute duty to advise an unrepresented claimant of his right to cross-examine."  *Id.*  Finding that the lack of notice did not substantially affect the claimant's substantial rights, the court emphasized that the administrative law judge's

"questioning of both the vocational expert and appellant was fair, searching and even-handed."
*Id*.

Similarly, in *Jacobs* the administrative law judge did not inform the pro se claimant "of his right to cross-examine."  997 F.2d 880, at *6.  The Fifth Circuit rejected the claimant's argument that the administrative law judge's omission required remand, explaining that the judge "did engage in a fair, searching, and even-handed questioning of both [the claimant] and the vocational expert."  *Id*.  Moreover, the court noted: "[The claimant] has not indicated any additional evidence he would have produced if he had been informed of his right to cross examine.  His substantial rights were not affected by the failure of the ALJ to inform him of his right to cross-examine."  *Id*. (footnote omitted).

The Eighth Circuit, it must be acknowledged, has expressed a contrary position (albeit in dictum).  *Coffin v. Sullivan*, 895 F.2d 1206, 1212 (8th Cir.1990) (dicta).  In *Coffin*, the Eighth Circuit held that an administrative law judge "is not required to inform the claimant's attorney that the claimant has a right to cross-examine the vocational expert.  The ALJ is required to allow the claimant to cross-examine the witness, but if the claimant's attorney . . . remains silent when the opportunity to request cross-examination arises, the right to cross-examination is waived."  *Id*. (citation omitted) (citing *Wallace v. Bowen*, 869 F.2d 187, 194 (3d Cir. 1988)).  In passing, the court went on to note:

> If Coffin had been unrepresented, he would not have waived his right to cross-examination.  If a claimant represents himself, the ALJ has a special responsibility to inform the claimant that he has the right of cross-examination. Coffin, however, was represented by a lawyer, an individual who is presumed to know about the right of cross-examination.

*Coffin*, 895 F.2d at 1212.

The Sixth Circuit, as noted, has not addressed the issue.  At least one district court within the Sixth Circuit has, however, and found the approach of the First and Fifth Circuits preferable to that of the Eighth.  *Chadwell v. Astrue*, 144 Soc. Sec. Rep. Serv. 307, 2009 WL 2448443, at *3 (E.D. Ky. Aug. 10, 2009) (Coffman, J.)

This Court agrees.  As noted, social security proceedings "are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. at 110.  The cross-examination of witnesses, however, is the product not of the inquisitorial systems of continental Europe, but "[t]he common-law tradition . . . of live testimony in court subject to adversarial testing."  *Crawford v. Washington*, 541 U.S. 36, 43 (2004); *see generally* Tom Cummins, Note, *Danforth v. Minnesota: The Confrontation Clause, Retroactivity, and Federalism*, 17 Geo. Mason L. Rev. 255, 259–62 (2009) (providing background on historical origins of common law right of cross-examination). In an inquisitorial system, in contrast, the judge is principally responsible for directing the questions.  *See generally* Antonia Sherman, Comment, *Sympathy for the Devil: Examining A Defendant's Right to Confront Before the International War Crimes Tribunal*, 10 Emory Int''l L. Rev. 833, 866 (1996) (observing that "in the inquisitorial system, a judge is responsible for examining witnesses; thus, the importance of cross-examination and a face-to-face confrontation is diminished").

Here, Judge Patterson in no way hindered Plaintiff from asking questions of the vocational expert, Ms. Tremblay.  He concluded his examination of Plaintiff by asking: "Ms. Thomas, is there anything else wrong with you that you want to tell me or talk to me about?"  R. at 42.  "No," Plaintiff answered.  "Alright then, if you'll just be patient I am going to ask Ms. Tremblay a few questions and then [when] I finish talking to her I'll talk to you again."  R. at 43.

Ms. Tremblay was then questioned by Judge Patterson.   When he concluded the questioning, Plaintiff remained silent.  So Judge Patterson spoke up, again asking Plaintiff: "Ms. Thomas, have you thought of anything else that you would like me to know?"  R. at 45.  Plaintiff answered: "No, thank you."  R. at 45.  She did not seek to ask any questions of Ms. Tremblay. Plaintiff thus waived her right to cross-examine Ms. Tremblay.

Thus, Judge Patterson did not prevent Plaintiff from asking questions of the vocational expert, Ms. Tremblay.  Although the judge did not expressly inform Plaintiff that she had a right to question Ms. Tremblay, as in *Figueroa* and *Jacobs* Judge Patterson engaged in a fair, searching, and even-handed questioning of both Plaintiff and Ms. Tremblay.  Although the best practice may be to tell pro se claimants like Plaintiff of their right to question witnesses, given the inquisitorial nature of the proceeding not doing so does not offend due process.

Moreover, as in *Jacobs*, Plaintiff has not indicated any additional evidence she would have produced or testimony she would have elicited if she had been informed of her right to cross-examine the vocational expert.  Thus, Judge Patterson not expressly informing Plaintiff that she had the right of cross-examination did not affect Plaintiff's substantial rights.  Put simply, Plaintiff has not shown how expressly informing her of the right to question Ms. Tremblay would have made a difference.

Plaintiff's second objection will be overruled.

### 3

In Plaintiff's third objection, she reiterates her first objection and a portion of her second. Plaintiff writes:

> Again, as articulated in Plaintiff's Objection No. 1, the Vocational Expert
> testimony with regard to the Plaintiff's ability to perform any work was tainted by
> the ALJ's failure to fairly reflect the relied upon expert medical evidence and
> adequately portray all of Plaintiff's limitations to the Vocational Expert.  Further,

Plaintiff's denial of her due process right to cross-examine the Vocational Expert
taints both the expert's testimony and the ALJ's final determination.

Pl.'s Objections 7.  For reasons detailed above, this objection lacks merit.

Briefly, Judge Patterson's residual functional capacity assessment fairly reflects the
medical evidence and Plaintiff's limitations.  And not expressly instructing Plaintiff that she
could cross-examine Ms. Tremblay did not affect Plaintiff's substantial rights.

Plaintiff's third objection will be overruled.

**4**

Fourth and finally, Plaintiff again reasserts that Judge Patterson "failed to fully develop
the record despite his heightened duty to do so."  Pl.'s Objections 7.

For reasons explained above, Plaintiff's argument lacks merit.  Briefly, Judge Patterson
scrupulously explored the facts and circumstances of the plaintiff's claim.  He elicited responses
that accurately portrayed the extent of her limitations.  And his decision is supported by
substantial evidence.

Plaintiff's fourth objection will be overruled.

**IV**

Accordingly, it is **ORDERED** that Plaintiff's objection to Judge Hluchaniuk's report and
recommendation (ECF No. 20) is **OVERRULED**.

It is further **ORDERED** that the Judge Hluchaniuk's report and recommendation (ECF
No. 17) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment (ECF No. 11) is
**DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 14) is

**GRANTED**.

It is further **ORDERED** that the decision of the Commissioner is **AFFIRMED**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 26, 2013

<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 26, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>